**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

UNITED STATES OF AMERICA
and THE STATE OF FLORIDA,
*ex rel.* MANUEL CHRISTIANSEN
and BRIAN ASHTON,

       Case No. _____

       Plaintiffs,

       v.

       **FILED IN CAMERA AND UNDER SEAL**

EVERGLADES COLLEGE, INC.
doing business as
KEISER UNIVERSITY,

       Defendant.

_____/

**ORIGINAL COMPLAINT FOR DAMAGES UNDER THE FEDERAL**
**AND FLORIDA FALSE CLAIMS ACTS AND JURY DEMAND**

1.     This is a *qui tam* action to recover damages and civil penalties on behalf

of the United States of America and the State of Florida arising out of false claims

knowingly presented by defendant Everglades College, Inc., doing business as Keiser

University ("Keiser"), to obtain millions of dollars annually from the US Department of

Education pursuant to the Higher Education Act ("HEA"); the US Department of

Veterans Affairs ("VA") through the post 911 GI Bill; and the State of Florida through

grant and scholarship programs administered by the Florida Department of Education.

2.     Operating under a widespread, pervasive culture of corruption, Keiser

executives routinely fabricate documents, manipulate data and intentionally make false

statements in order to receive at least $750 million in federal HEA Title IV funds and

Veterans Administration Education Benefits and Tuition Assistance Funds from 2006

through 2010.  These false claims arise through Keiser's falsely representing and

certifying its compliance with the HEA's prohibition against using incentive payments for recruiters for recruiting activities, which is a prerequisite for eligibility for Title IV funds. Keiser knows and continues to have actual knowledge that it violates the HEA ban, and that their representations and certifications of compliance were and are false.  During that same period from 2006 through 2010, Keiser also requested and received at least $50,000,000 from Florida State and local funding sources as a direct result of Keiser's false certifications of compliance with HEA Title IV statutory requirements.

      3.     Because Keiser compensates and penalizes its admissions counselors solely based upon the number of students recruited by each admissions employee, Keiser's compensation system, as designed and/or as implemented, falls outside of, and is not eligible for, the HEA's regulatory safe harbor, because the compensation awarded under Keiser's system does not constitute "fixed compensation" within the meaning of the regulatory safe harbor.

      4.     Keiser also knowingly presented false claims when it requests and receives hundreds thousands of dollars annually from the VA by representing that is in compliance with VA certification requirements under the Post 911 GI Bill program. However, Keiser not only knew that it was not in compliance with these VA education benefit certification requirements, but also intentionally manipulated records and fabricated data to receive post 911 GI Bill funds for a student enrolled in a course of studies that was not certified to receive such funds; and manipulated records to obtain VA funds for Keiser employees who attend Keiser tuition-free under the school's tuition remission program.

5.    These false promises, intentional misrepresentations, fabricated records and fraudulent claims for payment are all false claims that violate 31 USC §3729(a)(1) and unjust enrichment.

6.    Moreover, because institutional eligibility for Florida State grant and scholarship funds depends upon Keiser's HEA Title IV compliance and eligibility, Keiser's falsely certifying compliance with HEA Title IV participation requirements also resulted in Keiser knowingly presenting false or fraudulent claims for millions of dollars in Florida state grants and scholarships in violation of Fl. Stat. §§68.082(2)(a) and (b).

### JURISDICTION and VENUE

7.    This is an action brought under the federal False Claims Act 31 U.S.C.§3729(a)(2), and this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §1331.

8.    This Court has personal jurisdiction over Everglades College, Inc., doing business as Keiser University, under 31 USC §3732(a), because Defendant transacts business this District, is found within this District, and many of the acts proscribed by 31 U.S.C. §3729 occurred within this District.

9.    This Court has supplemental jurisdiction over Florida state law claims pursuant to 28 U.S.C. §1367.

10.    Venue is proper under 31 U.S.C.§3732(a), and under 28 U.S.C. §§ 1391(b) and 1395(a) because Everglades College, Inc. is a Florida corporation with its principal office located in Ft. Lauderdale, Florida.  In addition, Everglades College, Inc. maintains and operates a traditional primary campus and online program within this District.  Further, the acts that form the basis of this Complaint occurred in this District.

## PARTIES

11.     *Qui Tam* Plaintiff Manuel Christiansen  is a legal resident of Broward County in the state of Florida.  Christiansen has been employed at defendant Keiser University since 2006, and currently holds the position of Senior Admissions Counselor for the Keiser University Graduate School located at defendant's Ft. Lauderdale, Florida campus.  Mr. Christiansen's primary duties consist of recruiting applicants for admission to the Graduate School, including managing and securing new student inquiries, scheduling and conducting interviews of potential students, determining the appropriateness of potential students for admission, and achieving enrollment goals. Through his employment at Keiser University, Mr. Christiansen has personal knowledge of the destruction of records, manipulation of computer information, fabrication of documents and false records, statements, certifications and claims that Keiser presented to the United States, the Department of Education and the Department of Veterans Affairs.  Christiansen brings this action on behalf of the United States of America and the State of Florida.

12.     *Qui Tam* Plaintiff Brian Ashton is a citizen of the United States of America and is currently a resident of the state of Georgia.  Ashton was an employee of Keiser University from July 2010 through May 2011, and served as the Admissions Director of the Graduate School.  Ashton's primary duties were to supervise the admissions counselors for the Graduate School, including conducting their performance reviews and appraisals, coordinating work schedules and establishing enrollment goals. Through his employment with Keiser University, Mr. Ashton has personal knowledge of the false records, statements, certifications and claims that Keiser presented to the

United States, the Department of Education and the Department of Veterans Affairs. Ashton brings this action on behalf of the United States of America and the State of Florida.

13.    As required under the False Claims Act, 31 U.S.C. §3730(a)(2), Relators provided to the United States Attorney for the Southern District of Florida a statement of all material evidence and information related to this Complaint.  This disclosure statement supports the existence of "submission of a knowingly false or fraudulent claim for payment or approval," under the False Claims Act, 31 U.S.C. §3729(a)(1).

14.    The United States of America is here named a plaintiff because federal funds of the United States of America were and are awarded to Keiser University pursuant to the Title IV of the HEA and Chapter 33 of the GI Bill as a result of the false claims alleged in this Complaint.

15.    Defendant Everglades College, Inc., is a Florida non-profit corporation which owns, operates and, among other things, does business as Keiser University ("Keiser"), and has a mailing address at 1900 W. Commercial Blvd., STE 180, Fort Lauderdale, FL 33309.  Until it was acquired by Everglades College in early 2011, Keiser University was a Florida for-profit corporation that provided educational programs for working adult students.  In 2010, Keiser University enrolled approximately 21,000 students in undergraduate and graduate programs across fourteen campuses and an online division.

16.    Managerial employees of Defendants were acting within the scope and of their respective agencies and or employment with defendant and each of them with the knowledge and consent of Defendant unless otherwise indicated.

## FACTUAL ALLEGATIONS

I.  **HEA Title IV Fraud**

A.  **HEA Title IV Program Participation Requirements**

17.     The United States government awards approximately $6 billion a year to help students obtain their education at colleges and vocational schools.  The federal funds, however, do not go to the students.  Instead, the educational institution requests the funds of the United States Department of Education or a third party intermediary lender.  The United States government or the lender wires the funds directly into the institution's accounts and the institutions then credit their students for tuition.

18.     Title IV of the Higher Education Act of 1965 ("HEA"), 20 U.S.C. §§1070 *et. seq.* establishes various student loan and grant programs, including, but not limited to the federal Pell Grant program, the Federal Family Education Loan ("FFELP") program and the Federal Direct Loan program (collectively, "Title IV funding").

19.     Students are responsible for paying back loans backed by or subsidized by the United States government once they graduate or stop attending the University. Students disqualified from the University must still repay the federal loans.  These students, unable to complete their education and obtain a decent paying job are forced into a dire financial situation.

20.     To become eligible to receive Title IV funding institutions must first enter into a program participation agreement ("PPA") with the federal Department of Education ("DOE").   20 U.S.C. §1094(a); 34 C.F.R. §668.14.  Each PPA expressly conditions a school's eligibility to receive HEA Title IV funds on compliance with specific

statutory and regulatory requirements, including 20 U.S.C. §1094 and 34 C.F.R. §668.14.

21.     Title IV of the HEA prohibits colleges and universities from providing "**any** incentive commission, bonus or other **incentive payment** . . ." to recruiters based on recruiting activities.  HEA, sections 487(a) and 487(a)(20), 20 U.S.C. §1094(a)(20);34 C.F.R. §668.14(b)(22).  The statutory ban ("Incentive Compensation Ban") was enacted in 1992 amid reports of numerous institutions enrolling unqualified students just to receive federal student aid funds from the United States government.  The statutory Incentive Compensation Ban is a core prerequisite for an educational institution's eligibility to request and receive Title IV funds.  As the Seventh Circuit's Judge Easterbrook noted in 2005, "the concern is that recruiters paid by the head are tempted to sign up poorly qualified students who will derive little benefit from the subsidy and may be unable or unwilling to repay federally guaranteed loans."[1]  It is also a key element in being accredited by the Department of Education.  And no accreditations means no access to federal funds, regardless of whether they are VA funds, Dept. of Education Funds, or funds from private lenders backed by a governmental agency.

22.     In 2002, the Department of Education ("DOE") enacted regulatory safe harbors which specified certain activities that would not violate the Incentive Compensation Ban. The regulatory safe harbors clarify that schools may pay "fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as their

---

[1] *United States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916 (7th Cir. Ind. 2005).  Further, making this point, when Congress amended the HEA in 1992 to prohibit schools from paying these incentives, it did so based on evidence of serious program abuses, including incentive compensation. See S. Rep. No. 58, 102d Cong., 1st Sess., at 8 (1991) ("Abuses in Federal Student Aid Programs") (noting testimony "that contests were held whereby sales representatives earned incentive awards for enrolling the highest number of students for a given period") [App. B, at 43]; H.R. Rep. No. 447, 102d Cong., 2d Sess., at 10, *reprinted in* 1992 U.S.C.C.A.N. 334, 343 (noting new provisions that "include prohibiting the use of commissioned sales persons and recruiters").

compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled or awarded financial aid." 34 C.F.R. §668.14(b)(22)(ii)(A).  These safe harbors expired on July 1,  2011.

23.    Keiser, in requesting and receiving  over one hundred million dollars a year in Title IV funds, every year falsely certifies to the DOE compliance with the Incentive Compensation Ban in the Agreement that it submits annually to the DOE. Keiser falsely induces the Government to approve and/or pay out the Title IV funds, based on its false promises to comply with the Incentive Compensation Ban. The promises when made are false. Upon making its promises and certifications, Keiser knowingly engages in the illegal incentive compensation schemes detailed below.

24.    Keiser every year also falsely asserts compliance with the Incentive Compensation Ban in "Management Assertion Letters" written by Keiser management for an annual compliance audit. Keiser must submit to the United States Government this annual compliance audit performed by an independent certified public accountant. Participation in the Title IV program is conditioned upon Keiser submitting these audits certifying compliance with the HEA Incentive Compensation Ban. Keiser is ineligible to submit any claims for HEA funds unless it submits this annual audit.

25.    As a required part of the audit, Keiser certifies in a management assertion letter that it had "not paid to any persons or entities any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments… for each year at issue."  Keiser knows this certification is false because Keiser intentionally violates the Incentive Compensation Ban.

### B.   Keiser's False Claims for HEA Title IV Federal Government Funds

26.     Upon entering into the Program Participation Agreement with the United States Secretary of Education, Keiser is eligible to request  Title IV funds from the United States Secretary of Education (for Pell Grant funds) or from third party lenders (for government-insured loans).

27.     For Pell Grant funds, Keiser submits a request for those funds directly to the Secretary of the United States Department of Education. The request for funds is not a student application but a request prepared and transmitted by Keiser to the Secretary of the United States Department of Education, stating the requested amount of funds. The United States Department of Education transfers the Pell Grant funds electronically directly into a Keiser account. Upon receiving the Pell Grant funds, Keiser credits various Keiser students for tuition paid.  Keiser students do not request or receive a dime of the Pell Grant funds.

28.     Keiser's claims for Pell Grant funds are fraudulent.  When Keiser receives and retains the Pell Grant funds, Keiser knows it is ineligible for those funds because of its intentional violations of the HEA Incentive Compensation Ban. Keiser knows that compliance with the HEA Incentive Compensation Ban is a prerequisite for an institution's eligibility to request and receive the Title IV funds.

29.     For government-insured loans, including the FFELP, Keiser submits the request for those funds directly to a private lender. The Keiser request for government-insured loan funds, arranged, managed and prepared by Keiser, includes a student application that *contains an express certification by Keiser that the student is an eligible student under the Title IV program.* The claim for government-insured loans *must*

include this Keiser certification. Keiser knows that this claim for funds is false because Keiser knows its students are not eligible under the Title IV program due to Keiser violations of the HEA Incentive Compensation Ban. Only students at eligible Title IV schools may receive credit for the Title IV government-insured loan funds disbursed by private lenders to educational institutions.

30.     Keiser's fraudulent violations of the HEA Incentive Compensation Ban make it an ineligible educational institution to request and disburse Title IV funds, and thus its students are ineligible under the Title IV program. The lender, typically a bank, transfers the government-insured loan funds directly into a Keiser account. Upon receiving the government-insured loan funds, Keiser credits various Keiser students for tuition paid.

31.     Keiser's claims for the government-insured loan funds are fraudulent. When Keiser requests, receives and retains the government-insured loan funds, Keiser knows it is ineligible for those funds because of its intentional violations of the HEAIncentive Compensation Ban. Keiser knows that compliance with the Higher Education Act funding statute incentive compensation restriction is a core prerequisite for an institution's eligibility to request and receive Title IV funds.

32.     The United States Government pays all interest on the government-insured loans while the students are enrolled in classes and during authorized grace periods. The loans are guaranteed by state agencies or non-profit organizations (called "guarantee agencies"), and are subsidized and reinsured by the United States Department of Education. If a student defaults, the guarantee agency reimburses the

lender. If the guarantee agency cannot collect from the student, the Department of Education reimburses the agency.

33.     The United States Department of Education monitors loan defaults of post-secondary schools and calculates a "cohort default rate" every year for Keiser. The Department of Education calculates the loss to the United States Government relying upon this rate.

### C.     Keiser Violates the HEA Incentive Compensation Ban

34.     From at least July 1, 2006 through the present, Keiser, in flagrant violation of the HEA Title IV Incentive Compensation Ban, compensates and penalizes admissions counselors based directly and solely upon the number of students that each admission counselor enrolls.  The value of whatever incentive or penalty that Keiser gives to, or imposes upon, an admissions counselor is directly and solely related to that admissions counselor's enrollment numbers.

35.     Keiser operates under a pervasive culture of corporate corruption, in which university executives routinely manipulate computer information, fabricate documents and place unrelenting pressure on admission counselors – who act as in-school recruiters – to meet enrollment targets.  Through its compensation practices and its routine falsification of records, the representations and certifications that Keiser makes to the federal government in its PPAs, in connection with annual compliance audits, and in other documents, Keiser knowingly violates Title IV of the HEA's Incentive Compensation Ban and operates outside the confines of the Regulatory Safe Harbor, and their implementing regulations.

36.    **Admissions Counselors' compensation is based solely upon enrollment numbers.**  Keiser's admission counselors serve as the school's student recruiters.  Admissions counselors, including Relator Christiansen, are responsible for recruiting applicants for admission to Keiser schools and campuses, including securing and managing new student inquiries, achieving enrollment and start rate goals, and participating in recruitment and enrollment activities.  An admissions counselor is in frequent contact with potential students during the entire recruitment and enrollment process.

37.    Keiser compensates its admissions counselors solely upon the number of enrollments that the counselor achieves within a specified period.  The highest paid admissions counselors are those with the highest number of student enrollments.   To conceal its performance-based compensation policy, Keiser uses so-called "activity levels" – levels of activities such as phone calls and interviews -- as a pretext or proxy to award compensation.  But irrespective of a counselor's activity level, counselors with the highest enrollments uniformly receive the highest compensation.

38.    **Admissions Counselors who fail to meet goals are required to work overtime on days off at half pay.**  Keiser employs weekly goals called START plans.  If the admissions counselor fails to meet these weekly goals, they are required to work overtime at half their normal hourly rate of pay.  Moreover, a counselor's failure to meet the targets will result in that counselor being required to come into work overtime on that counselor's normal day off.

39.    In this manner, admissions metrics are surreptitiously implemented through penalties such as mandatory overtime and deprivation of off-days – all at half-

pay or no pay.  By compelling the lower-achieving admissions counselors to work longer hours at the same rate of pay, lower-producing admissions counselors earn less per hour than the higher-producing admissions counselors.  Keiser imposes this penalty solely on the basis of an admission's counselor's enrollment numbers, and as a result, the higher-producing admissions counselors are compensated at a higher effective salary.

40.    **Admissions Counselors are rewarded with gifts and cash.**  In addition to concealing compensation through mandatory unpaid overtime requirements, Keiser also illegally compensates admissions counselors who meet their enrollment targets through improper gifts such as:

(a)    Keiser upper level managers routinely award to admissions counselors gift cards redeemable from  $10 to $50 based solely upon their enrollment results;

(b)    in at least one instance, Keiser Vice President Rhonda Fuller personally gave an admissions counselor $500 cash in an envelope solely based upon that counselor's high enrollment results;

(c)    the Ft. Lauderdale campus president or vice president would routinely buy restaurant meals for admission counselors that met certain enrollment targets;

(d)    Keiser would pay for employees' attendance at a spa located within Ft. Lauderdale for admissions counselors who reach targeted goals or go beyond;

(e)    Keiser would pay for top admissions counselors to embark on a one day cruise out of Ft. Lauderdale;

(f)      top admissions counselors would receive gifts such as beach towels, thermos, etc.; and

(g)      top admissions counselors would get paid time off such as a half day off when meeting targets.

41.     Keiser awards these gifts and cash to admissions counselors solely on the basis of enrollment numbers.  The admissions counselors who have the higher enrollment numbers obtain these gifts and cash, regardless of their other activity levels such as phone calls or interviews.   They even go so far as to claim "Dr. Keiser" himself is providing bonuses to try and disguise the true correlation for why bonuses are given. See **Exhibit 5** (Email from Interim Vice President to Manuel Christiansen re bonus).

42.     **Low enrollment numbers lead to discipline and employment termination.**  If an admissions counselor fails to reach acceptable enrollment activity, Keiser will  place that counselor on a performance plan setting forth minimum enrollment activity goals.  Unsuccessful completion of a performance plan – that is, unacceptable enrollment numbers --  leads to termination of the counselor's employment.  Because Keiser's unwritten policy  was to state that admissions counselors managed "activities" rather than enrollments., Keiser would then fabricate documents to cover up the cause of the  termination as resulting from low enrollment numbers and instead characterize these terminations as being caused by "low activity levels."

43.     Keiser uses "poor activity levels" as a pretext and proxy for terminating admissions counselors.   Admissions counselors Glorimar Salgado and Angela Hayles were both fired solely because they were not enrolling enough students.  But Keiser

covered up the fact that they were fired due to low enrollment, and instead Keiser

Human Resources created paperwork that claimed these employees were fired due to

their "poor activity levels."  However, both of these  former employees had acceptable

activity levels (calls, talk time and interviews) yet, they both were not enrolling and

starting enough students. There were several layers of approvals required to terminate

an employee including, Director of Admissions, Campus President (Barbara Loven),

Regional Vice President (Rhonda Fuller), Chief Operating Officer (Peter Croscito) and

the Chancellor of HR. Each member of the chain ensured that paperwork was

manufactured to indicate that purportedly "poor activity levels" were the cause of

termination and not student enrollments or starts.  As Keiser Associate Admissions

Director, Jean Pierre, was quoted as saying in the September 3, 2010, Sun Sentinel

article titled Controversial high school diplomas create turmoil at Keiser University,

"everybody knew our job is a numbers job.  If you do not make your numbers, you lose

your job."

   44. **Keiser routinely falsifies, destroys and fabricates documents and

manipulates data.**  In order to further its schemes to present false claims to the federal

and state governments, Keiser routinely falsifies and fabricates documents, destroys

documents and manipulates electronic information and data.  Keiser fabricated

documents and manipulated information in the following instances:

   (a) Keiser falsified data to fabricate VA education funding eligibility for

a student enrolled in a course of studies that was not certified to receive VA educational

funds.  Nancy Comesanas, a Spanish-speaking MBA-candidate from Puerto Rico,

initially enrolled in Keiser's English MBA program at the Ft. Lauderdale campus on

February 28, 2011.  That program was taught exclusively in English and was certified to receive VA education benefits; accordingly, the VA then paid Keiser $15,000 which was fifty percent of Ms. Comesanas's $30,000 tuition pursuant to the Chapter 33 Post 911 GI Bill program.  However, due to her English comprehension difficulties, Ms. Comesanas switched her enrollment to the Spanish MBA program the following week. Unlike the English MBA program, the Spanish MBA program was not certified to receive VA-funding in February of 2011.  *But executives at Keiser manipulated data to show that Ms. Comesanas was still enrolled and attending classes in the English MBA program from March 2011 through  May 1, 2011.*  Then, when the Spanish MBA program was certified on  May 1, 2011,  Keiser executives again manipulated data to show that Comesanas was now in the  newly-certified Spanish MBA program.  Keiser never informed the VA that Ms. Comesanas was enrolled and attending classes in the Spanish MBA program during a period in which that program was not certified to receive VA funds.  Instead, Keiser fraudulently concealed Ms. Comesana's enrollment in the Spanish  program, and fraudulently claimed that Ms. Comesanas was in the English MBA-program in order to wrongfully receive VA tuition assistance.  See **Exhibit 6** (documents concerning Nancy Comesansa).

(b)    Hugh Millard and Curtis Riley, both military veterans and Keiser admissions counselors, enrolled in Keiser University's Ft. Lauderdale Campus undergraduate program in Business Administration in the fall of 2004 through at least 2006.  As Keiser employees, both Mr. Millard and Mr. Riley attended classes free under Keiser's tuition remission plan for employees.  However, Keiser fabricated documents to conceal the fact that Millard and Riley were Keiser employees who attended Keiser free

under the tuition remission program; and instead Keiser applied for and wrongfully

received VA Chapter 33 tuition funds for both Mr. Millard and Mr. Riley.

              (c)     Keiser officials routinely fabricate documents to indicate that

terminated admissions counselors, including Glorimar Salgado and Angela Hayles,

were terminated due to purportedly low activities.  "Low activity levels" are merely a

pretext that Keiser officials use to terminate admissions counselors that fail to meet

targeted enrollment numbers.   In actuality, Keiser terminated these admissions

counselors solely on the basis of their low enrollment and admissions numbers. **See

Exhibit 1.**  Salgado and Hayles both had few enrollments, but had above average

phone calls, average to below average number of interviews and average amount of

talk time.  It is the lack of enrollments that was the factor that led to their termination, not

low activity levels.  Keiser Regional Vice President Rhonda Fuller verbally directed

Relator Ashton to terminate Salgado and Hayles _solely_ because of the low enrollments.

Relator Ashton's Assistant Director of Admissions, Scott Deming, was present in these

conversations.   Fuller then covered up the true cause of the terminations by fabricating

or causing others to fabricate documents to suggest that "low activity levels" were the

cause of terminations.

      45.    **Keiser pressures counselors to enroll unqualified students.**  Keiser

urges admissions counselors to enroll students that the counselors know are not

qualified to complete course requirements.  Students that have low grade point

averages are enrolled even though Keiser knows they will drop out due to their not

meeting minimum standards of the school.  Moreover, Keiser regularly instructs

admissions counselors to enroll students who have poor command of, or even no

command of, English in English-instructed programs.  Even though these students will do poorly in their courses or fail, they must still pay the full tuition price and are financially obligated to the school, even if they fail to compete their course of studies.

46.    **Keiser closely tracks Admissions Counselors' enrollments and ignores other factors.**  Keiser continuously measures each admissions counselor against his or her own "Counselor Start Plan."  A Start Plan sets forth the number of students that an admissions counselor is expected to enroll during an academic semester.  An example of a Start Plan for Manual Christiansen and how closely numbers are monitored using spreadsheets is attached hereto at **Exhibit 2.**   Nothing in the Start Plan discusses quality factors such as a student's qualifications, grade point average or estimated success in completing their course of studies.  Instead, the Start Plan focuses exclusively on the number of students the admissions counselor enrolls.

47.    Keiser evaluates and compensates its admissions counselors annually based on whether that admissions counselor has met his enrollment targets in the Start Plan.  In evaluating admissions counselors for their annual performance reviews, Keiser instructs its Admissions Directors, including Relator Ashton, to refer to the Start Plans to assess whether the admissions counselor has met his/her enrollment  goals.  Whether an admission counselor has met that enrollment target is the only criterion actually considered in performance evaluations, regardless of other written criteria such as interviews conducted or phone calls are made.

48.    The walls and cubicles partitions of Keiser's offices display posters and charts graphing each admissions counselor's progress towards his/her student enrollment  goals. See **Exhibit 3**.  However, when an audit of Keiser or an accreditation

survey or inspection is about to take place, Keiser's management ensures that these materials are taken down and removed from view.  Once the auditors or accreditors depart, the posters and charts are put back up.   Keiser's demand for enrollment numbers and federal funding is so great it even fraudulently create records to qualify students for Pell Grants.  Diana Pachon is one such example.  Ms. Pachon has a bachelor's degree.  She came to Keiser to student English at the Latin Division of Keiser.  The university forced her into enrolling into a bachelor's degree program and claimed a Pell Grant for her.  However, Pell Grants are not allowed for students who already possess bachelors programs. Now Ms. Pachon is in the whole about $18,000 in federal loans and grants.   Keiser knew she had a bachelor's degree.  She told them. There is also documentation that exists noting this from Josef Silny.  See **Exhibit 4** (records concerning Diana Pachon).

49.     Keiser is fully aware of its compensation/incentive/overtime scheme and that its compensation for admissions counselors violate the Incentives Compensation Ban. Senior management avoids explicitly writing anything that states or implies that admissions counselors' compensation is based on enrollments, yet they verbally instructed Ashton and other Admissions Directors to fire or discipline admissions counselors that fall short of student enrollment targets.  Moreover, Keiser will compensate its admissions counselors solely on the basis of enrollment numbers regardless of whether such admissions counselors have failed to meet other standards such as numbers of phone calls made and interviews scheduled.  In private conversations with Admissions Counselors, Keiser officials repeatedly acknowledge that

enrollments are the sole factor in compensation and mandatory overtime requirements and termination of counselors.

II.     **Veterans Affairs Educational Benefits Fraud**

    A.     **Veterans Educational Benefits Program Participation Requirements**

    50.     Educational benefits are available both to active duty personnel and veterans through several programs; the most important are the Montgomery GI Bill and Post-9/11 Veterans Educational Assistance Act ("Post 911 GI Bill"), both administered by the Department of Veterans Affairs.

    51.     Until 2009, the primary program that provided educational benefits for Veterans was known as the Montgomery GI Bill ("MGIB"). 38 U.S.C §3011 *et. seq.* There are two versions of the Montgomery GI Bill: one for active duty soldiers and veterans and the other for members of the Reserves and National Guard. While qualifying and paying into these versions of the MGIB differ, the benefits that are paid out are essentially the same, as both programs pay for up to 36 months of educational benefits, and the benefits are paid directly to the individual.   This program is limited to individuals with at least three continuous years of service (six years of service for reservists), and generally requires that the service member has paid $1,200 into the program during the first two years of service.  MGIB benefits are paid directly to the individual.

    52.     Implemented in 2009, the Post-9/11 GI Bill provides one of the most comprehensive educational benefit packages ever provided to service members, veterans, and family members.  38 U.S.C. §3301 et seq.  Under this program, veterans, including National Guard and Reserve troops, who serve a minimum of 90 days active

duty after September 10, 2001, are eligible for 36 months of educational benefits. Benefits are provided on a credit hour basis, averaging $458 per credit hour in the 2010-11 academic year, which varies based on the price of in-state undergraduate tuition at public universities in the state of residence. Thus, a veteran taking 12 units at a for-profit school with 10-week terms and a credit hour cost of $365 could receive tuition of $4,380 for each 10-week term. Other benefits are available through the Post-9/11 GI Bill including assistance with fees, a housing allowance for students taking classes on campus, books, tutorial assistance, and licensing exam costs. This benefit pays tuition and required fees directly to the university.

53.     In its first year of implementation, the Post 911 GI Bill program paid out more than $1.75 billion in total benefits.  For-profit universities such as Keiser (until it converted to non-profit status in 2011) collected about $640 million of that amount, or about 36%, despite the fact that these schools enrolled fewer than  a quarter of all GI Bill students.   Keiser University received more than $5.5 million in Post 911 GI Bill Funds in 2009, and was projected to receive more than $8 million in VA Education Benefits during fiscal year 2010.

54.     The Yellow Ribbon Program of the Post-9/11 GI Bill pays up to the highest public in-state undergraduate tuition and fees.  Effective August 1, 2011 the Post-9/11 GI Bill will pays all public school in-state tuition and fees or up to $17,500 annually for a private school.  Tuition and fees may exceed these amounts if you are attending a private school or are attending a public school as a nonresident student.  Institutions of Higher Learning may elect to participate in the Yellow Ribbon Program to make additional funds available for your education program without an additional charge to

your GI Bill entitlement.  Institutions that voluntarily enter into a Yellow Ribbon

Agreement with VA choose the amount of tuition and fees that will be contributed. VA

will match that amount and issue payment directly to the institution.

55.     To become eligible to receive VA Education Benefits, institutions must

also remain in compliance with accreditation from the Department of Education and Title

38 of the U.S. Code.  Failure to comply with Title IV standards and program participation

requirements, including first enter into a program participation agreement ("PPA") with

the federal Department of Education ("DOE") will subject the school to losing its

accreditation.   Each PPA expressly conditions a school's eligibility to receive HEA Title

IV funds on compliance with specific statutory and regulatory requirements, including 20

U.S.C. §1094 and 34 C.F.R. §668.14.

## COUNT I

### VIOLATION OF FEDERAL FALSE CLAIMS ACT – HEA TITLE IV FUNDS

**(Knowingly Making False Statements, Claims and Records to Get a False or
Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C.
§3729(a)(1))**

56.     Plaintiffs re-allege and fully incorporate paragraphs 1 through 55 as if fully

stated herein.

57.     Defendants knowingly presented or caused to be presented false or

fraudulent claims to the United States for payment, in violation of False Claims Act, 31

U.S.C. §3729(a)(1). Specifically, Keiser knowingly submitted or caused to be submitted

false certifications regarding compliance with the requirements of Title IV of the HEA, in,

*inter alia*, its PPAs and annual financial and compliance audits, as well as in student

loan and grant applications, in order to obtain eligibility to participate in Title IV, HEA

programs and receive Title IV funding, when in fact, Keiser's compensation systems, as implemented by Keiser, was in practice, the sole factor that determined changes to the compensation of Keiser's admissions personnel was the number of students recruited by the admissions employee during the previous twelve months. In submitting or causing to be submitted such certifications and applications, Keiser acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

58. Keiser made express representations in writing to the Department of Education that it would not make incentive payments to its admissions personnel based directly or indirectly on their success in securing enrollments. These representations induced the Department of Education to make students at Keiser eligible for many forms of financial aid. These representations were material to the Department of Education's decision to make Keiser eligible for these financial aid programs. At the time Keiser made these representations, it knew that admissions personnel incentive payments based on their success in securing enrollments. Therefore, Keiser fraudulently induced the Department of Education to make Keiser eligible to participate in the Title IV, HEA programs, and each and every one of the claims it submitted or caused a student to submit violated the FCA.

59. Even if Keiser had not affirmed to the government that it would comply with the Incentive Compensation Ban, the mere fact that such compliance was material to the government's decision to make Keiser eligible for Title IV, HEA programs, combined with the fact that Keiser, knowing that it was in violation of the Incentive Compensation Ban and therefore ineligible to receive such student financial aid,

submitted claims for student financial aid, caused students to submit claims for student financial, and/or received such aid, makes Keiser liable under the FCA.

60. Simply stated, the Defendant here made a record and/or statement in order to get the government to pay money; the record and/or statement was false or fraudulent; and the defendant knew it was false and/or fraudulent.[2]  Accordingly, and by virtue of the false or fraudulent claims Defendant presented or caused to be presented, the United States Government has suffered substantial monetary damages.

## COUNT II

### FALSE CLAIM THROUGH PROMISSORY FRAUD

61.    This is a claim for recovery of monies paid by the United States to Defendant because of promissory fraud or fraud-in-the-inducement.   The Defendant made false statements and/or engaged in a fraudulent course of conduct, made with *scienter*, that was material, causing the government to pay out money or forfeit monies due.  Indeed, as the Ninth Circuit said in 2006, *United States v. Univ. of Phoenix*, 461 F.3d 1166 (9th Cir. Cal. 2006), "the False Claims Act is intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. Each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim. The principles embodied in this broad construction of a false or fraudulent claim have given rise to two doctrines that attach potential False Claims Act liability to claims for

---

[2] The elements of a False Claim under the FCA can be found at  *United States ex rel. Lamers v. Green Bay,* 168 F.3d 1013, 1018 (7th Cir. 1999)

payment that are not explicitly and/or independently false: (1) false certification (either express or implied); and (2) promissory fraud. "

62.     The Plaintiffs reallege and incorporate by reference paragraphs 1 through 55 as if fully set forth herein.

63.     Because Keiser's compensation system based changes in admissions personnel compensation upon the number of students recruited by the admissions personnel during the previous twelve months, Keiser's compensation system as designed violated the Title IV of the HEA.

64.     Keiser's compensation system was not eligible for Title IV of the HEA's Regulatory Safe Harbor, because the compensation awarded under that system did not constitute "fixed compensation" within the meaning of the Regulatory Safe Harbor. Instead, the compensation awarded there under constituted a form of prohibited incentive payments, spread out over the subsequent compensation period.

65.     Even if Keiser's compensation system as designed was eligible for the Regulatory Safe Harbor, it was not compliant with the Regulatory Safe Harbor as implemented.  In practice, the sole factor that determined changes to the compensation of admissions personnel was the number of students recruited by the admissions employee during the previous twelve months.

66. The United States, acting in reasonable reliance on the accuracy and truthfulness of the information contained in the claims, paid to the Defendants certain sums of money each time a request for government funds was made to which they were not entitled, and Defendants are thus liable to account and pay such amounts, which are to be determined at trial, to the United States.  The Defendant had no intent to

comply with the representations it made to secure the government funds.  Keiser's

representations were not innocent mistakes, nor mere negligent misrepresentations.

## COUNT III

## UNJUST ENRICHMENT

67.  This is a claim for the recovery of monies by which Keiser has been unjustly

enriched.

68.  The Plaintiffs reallege and incorporate by reference paragraph 1 through 55

as if set forth fully therein.

69.  As described above, the Defendants received, and/or have continued to mail

control over, federal monies to which they were not entitled.

70. By directly or indirectly obtaining federal funds to which they were not

entitled, Defendants were unjustly enriched and are liable to account and pay such

amounts, or the proceeds therefrom, which are to be determined at trial, to the United

States.

## COUNT IV

### VIOLATION OF FLORIDA FALSE CLAIMS ACT,
### FALSE CLAIMS FOR PAYMENT
### § 68.082(2)(a), FLA. STAT

71.  Plaintiffs reallege and incorporate by reference the allegations made in

paragraphs 1 through 55 of this Complaint.

72. Defendants knowingly presented or caused to be presented to an officer or

employee of an agency of the State of Florida, false or fraudulent claims for payment or

approval in violation of the § 68.082(2)(a), Fla. Stat.

73.  During the academic years 2006/2007 through 2009/2010, Defendants received approximately $ 50,487,000 in state funds as a result of Defendants' presentation to an officer or employee of an agency of that State of Florida a claim for payment or approval in connection with student grants and scholarships.

74.  The institutional eligibility requirements for participation in Florida scholarship and grant programs include that the institutions are Title IV eligible and therefore in compliance with that applicable Title IV regulations.  Defendants represented their institutions as Title IV eligible in connection with Defendants' presentation of said claims for payment or approval.  Such representations were false, for the reasons set forth in the foregoing paragraphs.

75.  As a result of the Defendants' conduct as set forth in these causes of action, the State of Florida has suffered actual damages in excess of $15,000.00.

76.  Pursuant to §§ 68.082(2) and 68.086, Fla. Stat., the State of Florida is entitled to treble the amount of actual damages sustained, and no less than $5,500 and not more than $11,000 in civil penalties per claim, attorneys' fees, expenses, and costs.

## COUNT V

## VIOLATION OF FEDERAL FALSE CLAIMS ACT – VA EDUCATIONAL BENEFITS

**(Knowingly Making False Statements, Claims and Records to Get a False or Fraudulent Claim Paid or Approved, in Violation of the False Claims Act, 31 U.S.C. §3729(a)(1))**

77.  Plaintiffs re-allege and fully incorporate paragraphs 1 through 55 as if fully stated herein.

78.  Defendants knowingly presented or caused to be presented false or fraudulent claims to the United States for payment, in violation of False Claims Act, 31

U.S.C. §3729(a)(1). Specifically, Keiser knowingly submitted or caused to be submitted false certifications regarding compliance with the requirements various VA educational benefits, including the GI Bill, Yellow Ribbon Program, and Post 9/11 GI Bill, along with Title IV of the HEA, in, *inter alia*, its PPAs and annual financial and compliance audits, as well as in student loan and grant applications, in order to obtain eligibility to participate in VA, Title IV, HEA programs and receive Title IV funding, when in fact, Keiser's compensation systems, as implemented by Keiser, was in practice, the sole factor that determined changes to the compensation of Keiser's admissions personnel was the number of students recruited by the admissions employee during the previous twelve months. In submitting or causing to be submitted such certifications and applications, Keiser acted with actual knowledge, reckless disregard, or deliberate ignorance of the truth or falsity of the claims.

79. Indeed, 38, USC, Sec. 3684, says regarding Veterans' benefits to education institutions: that the "Secretary, prior to making payment of a reporting fee to an educational institution, as provided for in subsection (c) of this section, shall require such institution to certify that it has exercised reasonable diligence in determining whether such institution or any course offered by such institution approved for the enrollment of veterans or eligible persons meets **all** of the applicable requirements of chapters 31, 34, 35, and 36 of this title [38 USCS §§ 3100 et seq., 3451 et seq., 3500 et seq., and 3670 et seq.] and that it will, without delay, report any failure to meet any such requirement to the Secretary." (emphasis added).

80. Keiser made express representations in writing to the Department of Education and U.S. Department of Veterans Affairs that it would not make incentive

payments to its admissions personnel based directly or indirectly on their success in securing enrollments.  These representations induced the Department of Education and VA to make students at Keiser eligible for many forms of financial aid.  These representations were material to the VA and Department of Education's decision to make Keiser eligible for these financial aid programs.   At the time Keiser made these representations, it knew that admissions personnel incentive payments based on their success in securing enrollments.  Therefore, Keiser fraudulently induced the VA and Department of Education to make Keiser eligible to participate in the Title IV, HEA, and VA programs, and each and every one of the claims it submitted or caused a student to submit violated the FCA.

81.  Even if Keiser had not affirmed to the government that it would comply with the Incentive Compensation Ban, the mere fact that such compliance was material to the government's decision to make Keiser eligible  for  VA, Title IV, HEA programs, combined with the fact that Keiser, knowing that it was in violation of the Incentive Compensation Ban and therefore ineligible to receive such student financial aid, submitted claims for student financial aid, caused students to submit claims for student financial, and/or received such aid, makes Keiser liable under the FCA.

82. Simply stated, the Defendant here made a record and/or statement in order to get the government to pay money; the record and/or statement was false or fraudulent; and the defendant knew it was false and/or fraudulent.[3]  Accordingly, and by virtue of the false or fraudulent claims Defendant presented or caused to be presented, the United States Government has suffered substantial monetary damages.

---

[3] The elements of a False Claim under the FCA can be found at *United States ex rel. Lamers v. Green Bay,* 168 F.3d 1013, 1018 (7th Cir. 1999)

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

### **To the RELATORS,**

A.  Judgment in favor of the United States of America against Defendant by reason of the violations of the False Claim Act as set forth above in Counts I and II, in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus civil penalty of not less than $5000 and not more than $10,000 for each violation, plus three times the amount of damages which the United States Government has sustained, under 31 USC 3729(a);

B.  Award the Relators, as the *qui tam* plaintiffs, of the maximum amount allowed under 31 USC Sec. 3730(d) of the Federal False Claims Act on the United States' recovery;

C.  Award to Relators all reasonable expenses which the Court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs;

D.  Punitive damages on all causes of action, to the extent allowable by law;

E.  Award all damages in the form of a common fund as the Supreme Court articulated in *Boeing Company v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980) and allow for attorneys' fees to be recovered from the common fund as a whole;

F.  Or in the alternative or if allowed jointly then jointly order judgment in favor of the United States of America against Defendant by reason of the violations of the

Florida False Claim Act § 68.082(2)(a) as set forth above, and for unjust

enrichment; and

G.  Such other and further relief as the Court deems proper.

**To the State of Florida**

A.  Three times the amount of actual damages which the State of Florida has

sustained as a result of Defendant's fraudulent and illegal practices;

B.  A civil penalty of not less than $5,500 and no more than $11,00 for each false

claim which Defendant caused to be presented to the State of Florid;

C.  Prejudgment interest; and

D.  All costs incurred in bringing this action.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury, under Fed. R. Civ. Procedure 38.

Respectfully submitted on this 1st of February,
2012 by counsel for the *Qui Tam* Plaintiffs:

Dale J. Morgado, Esquire (0064015)
Feldman, Fox & Morgado, P.A.
100 N. Biscayne Blvd.,
29th Floor, Suite 2902
Miami, Florida 33132
305-222-7850 Telephone
305-384-4676 Facsimile
Email:  dmorgado@ffmlawgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on 2/1/2012, a true and correct copy of the above and foregoing disclosure statement was forwarded via the United States Mail, certified, return receipt requested, Civil Fraud Unit in Washington, D.C., the United States Attorney's Office for the Southern District of Florida, and the Florida's Attorney General's Office and Chief Financial Officer.

Attorney in Charge for Relator/Plaintiff

4846-9888-9482, v. 2