**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 12-60185-CIV-DIMITROULEAS/SNOW**

UNITED STATES OF AMERICA and
THE STATE OF FLORIDA ex rel.
MANUEL CHRISTIANSON and
BRIAN ASHTON,

       Plaintiff/Relator,

vs.

EVERGLADES COLLEGE, INC. d/b/a
KEISER UNIVERSITY,

       Defendant.
_____/

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

THIS CAUSE is before the Court on the non-jury trial conducted from July 21, 2014, to July 24, 2014, where the Court considered the complaint brought by Relators Manuel Christiansen ("Christiansen") and Brian Ashton ("Ashton") and together with Christiansen, ("Relators" or "Plaintiffs") on behalf of the United States and the State of Florida against Defendant Everglades College, Inc. d/b/a Keiser University ("Keiser"). *See* [DE 286]. The Court received testimony from Armando Ortiz, Arthur Keiser, Sherri Olsen, William Searle, Rhonda Fuller, Sabrina Mohammed, Brian Woods, Peter Crocitto, Jason Delisle, and Antonio Argiz. The Court has considered the exhibits admitted into evidence and the arguments of counsel and has determined the credibility of witnesses. The Court has also considered Defendant's July 25, 2014 Post-Trial Brief [DE-313], Relators' July 30, 2014 Corrected Post-Trial Submission [DE-316], and the Government's August 6, 2014 Statement of Interest [DE-317].

1

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure (the "Rules"), the Court shall now make its findings of fact and conclusions of law.  The findings of fact are based on the preponderance of the evidence.  To the extent that the findings of fact as stated may be deemed conclusions of law, they shall be considered conclusions of law.  Similarly, to the extent the matters expressed as conclusions of law may be deemed findings of fact, they shall be considered findings of fact.

## I.      FINDINGS OF FACT

1.      This is a *qui tam* action originally filed pursuant to the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729-3733, and Florida False Claim Act (the "Florida FCA"), Fla. Stat. § 68.082(2)(a), for the recovery of damages and civil penalties on behalf of the United States of America and the State of Florida.  Relators, under the FCA and Florida FCA, have filed suit on behalf of the United States and the State of Florida.[1]

2.      Keiser is a non-profit corporation offering undergraduate and graduate programs for students on fourteen (14) campuses and through an online division.  Keiser has employed approximately 1361 admissions counselors over the last seven (7) years.

3.      Title IV of the Higher Education Act of 1965 (the "HEA"), 20 U.S.C. §§ 1070 et. seq. establishes various federal student loan and grant programs, including, but not limited to, the federal Pell Grant program, the Federal Family Education Loan Program, and the Federal Direct Student Loan Program (collectively, "Title IV Funding").  In order to matriculate at Keiser, many of Keiser's students receive Title IV Funding from the

---

[1] The FCA provides the United States with at least sixty (60) days to determine whether to intervene in the action and take over the litigation or to decline intervention and allow the Relators to prosecute the action.  *See* [DE 22 at 2] (citing 31 U.S.C. §§ 3730(b)(2) and (b)(4)).  On August 9, 2012, the Court issued an Order [DE 14] allowing the United States and the State of Florida until September 12, 2012, to determine whether to intervene.  On September 12, 2012, the United States filed a notice indicating that it would not intervene. [DE 15].  The State of Florida did not file any notice and, by default, declined to intervene.

federal government.   From 2006 through 2012, Keiser students received $1,288,162,457.97 in Title IV Funding.  *See* [Plaintiffs' Exhibit 149].

4. The $1,288,162,457.97 consists of the following, *see* [Plaintiffs' Exhibit 149]:

- <u>2006</u>
  - o   Grants (not requiring repayment):          $21,108,919.41
  - o   Loans (requiring repayment):          $64,452,018.21
- <u>2007</u>
  - o   Grants (not requiring repayment):          $23,068,998.35.
  - o   Loans (requiring repayment):          $85,407,720.39
- <u>2008</u>
  - o   Grants (not requiring repayment):          $29,587,021.19
  - o   Loans (requiring repayment):          $116,433,008.00
- <u>2009</u>
  - o   Grants (not requiring repayment):          $47,933,176.43
  - o   Loans (requiring repayment):          $162,706,442.90
- <u>2010</u>
  - o   Grants (not requiring repayment):          $66,720,561.41
  - o   Loans (requiring repayment):          $183,648,094.61
- <u>2011</u>
  - o   Grants (not requiring repayment):          $66,104,487.51
  - o   Loans (requiring repayment):          $164,931,327.00
- <u>2012</u>
  - o   Grants (not requiring repayment):          $66,352,865.40

3

      o      Loans (requiring repayment):              $189,707,817.16

5.      To establish eligibility to receive Title IV Funding, Keiser executed Principal Participation Agreements (the "PPAs") with the federal government.  Through the PPAs, Keiser certified, *inter alia*, the following:

> It will not provide, nor contract with any entity that provides, any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the awarding of student financial assistance, except that this requirement shall not apply to the recruitment of foreign students residing in foreign countries who are not eligible to receive Federal Student Assistance.

6.      Dr. Arthur Keiser ("Dr. Keiser"), Chancellor of Keiser University, executed PPAs on behalf of Keiser on the following dates, *see* [Plaintiffs' Exhibits 1-3]:

- April 16, 2007, for a period expiring on June 30, 2012;

- February 5, 2011, for a period expiring on February 28, 2011; and

- August 9, 2011, for a period expiring on June 30, 2014.

7.      Dr. Keiser executed electronic certifications (the "Electronic Certifications") on November 8, 2006; March 10, 2007; March 24, 2008; April 13, 2009; February 9, 2010; and August 12, 2011.  *See* [Plaintiffs' Exhibits 4-9].  Those electronic certifications stated as follows:

> I understand that if my institution provides false or misleading information, the U.S. Department of Education may deny the institution's request for eligibility to participate in federal student financial aid programs and/or revoke eligibility once it has been granted and (b) the institution may be liable for all federal student financial aid funds it or its students received. I also understand that I may be subject to a fine of not more than $25,000 or imprisonment of not more than five years, or both, for misinformation that is material to receipt and stewardship of federal student financial aid funds.

*See* [*id.*].

8.      From 2006 to 2012, Keiser participated in annual compliance audits (the "Compliance

Audits") conducted by an independent auditor to determine whether Keiser was in

compliance with the requirements for participating in federal student financial aid

programs.  *See* [Defendant's Exhibits 13-19].  For the audit covering the calendar year

ending December 31, 2006, the auditor concluded as follows:

> We have examined management's assertions, that The Keiser School, Inc.,
> d/b/a Keiser University complied with the specified compliance
> requirements regarding **Institutional Eligibility, Reporting** [Pell
> Program: Pell Payment Data - via Electronic Data Exchange ("EDE"),
> Recipient Data Exchange C'RDE") or Floppy Disk Data Exchange
> ("FDDE") - or Recipient Financial Management System ("RFMS"); Loan
> Reporting: Direct Loan Servicing System ("DLSS"), and Student Status
> Confirmation Reports ("SSCR"); and for the Campus based programs:
> Fiscal Operations Report and Application to Participate ("FISAP")],
> Student Eligibility, **Disbursements, Refunds/Return of Title IV Funds,
> GAPS and Cash Management, Perkins Loans, Administrative
> Capability** listed in Section II of the U.S. Department of Education's
> Audit Guide, *Audits of Federal Student Financial Assistance Programs at
> Participating Institutions and Institution Servicers*, relative to participation
> in the Federal Student Financial Assistance Programs during the year
> ended December 31, 2006.  Management is responsible for The Keiser
> School, Inc., d/b/a Keiser University's compliance with those
> requirements. Our responsibility is to express an opinion on The Keiser
> School, Inc., d/b/a Keiser University's compliance based on our
> examination.
>
> * * *
> In our opinion, The Keiser School, Inc., d/b/a Keiser University complied,
> in all material respects, with the aforementioned requirements for the year
> ended December 31, 2006.

*See* [Defendant's Exhibit 13 at 17].  The audits for 2007, 2008, 2009, 2010, 2011, and

2012 included the same conclusions.  *See* [Defendant's Exhibits 14-19].

9.      For each calendar year beginning in 2006 and ending in 2012, Keiser—through the PPAs,

Electronic Certifications, and Compliance Audits—submitted claims to the United States

government.  Those claims were necessary for Keiser's receipt of federal student aid on behalf of Keiser's students.

10. As established by internal Keiser emails and by the testimony of Keiser employees Rhonda Fuller, Sherry Olsen, Sabrina Mohammed, and Peter Crocitto, Keiser provided gift cards, paid days off ("token days"), and meals to admissions counselors based on the number of student enrollments secured by those admissions counselors.  The Court concludes that the gift cards, token days, and meals were not based on activity levels; they were incentives.

11. As a general proposition, it is possible that an admission counselor could have high activity levels (e.g. number of phone calls made, talk time, meetings, etc.) for a time period but obtain low enrollment numbers for that same time period.  However, there is no credible evidence that any admissions counselor who had high activity levels but lower or average enrollment numbers received a gift card, token day, or meal.  The gift cards, token days, and meals were, more likely than not, incentives based on the result of obtaining high enrollment numbers, without regard to the specific activities that produced enrollment numbers.  Keiser employees' testimony that the gift cards, token days, and meals were based solely on activity levels, and not on enrollments, was not credible.

12. The practice of providing gift cards, token days, and/or meals to admissions counselors based on enrollment numbers took place on at least two Keiser campuses from 2006 to 2009.  That practice was contrary to Keiser's official policy across all campuses.  That practice led to the provision of miscellaneous enrollment-based incentives that did not exceed an aggregate value of a few thousand dollars.[2]

---

[2] The preponderance of the evidence did not establish any reliable total value of the incentives.

13.     Prior to November 20, 2009, Dr. Keiser and Keiser's top policymakers were aware that gift cards and meals were given to employees in some contexts.  However, Dr. Keiser and Keiser's top policymakers were not aware of any practice of providing incentives–e.g., gift cards, token days, or meals—to admissions counselors based on enrollment numbers. At that time, therefore, Keiser had no knowledge of HEA violations arising from the improper provision of incentives to admissions counselors.[3]

14.     On or around November 20, 2009, Dr. Keiser and Keiser's top policymakers—through a letter from Kareem Edwards and an ensuing investigation—became aware that at least two Keiser campuses had provided gift cards, token days, and/or meals to admissions counselors as incentives for reaching enrollment goals.  At that time, Keiser first had knowledge of internal violations of the HEA.  Although some employees had knowledge of that practice prior to November 20, 2009, the knowledge was not sufficient to impute to Keiser until November 20, 2009.[4]

15.     In response, and to its credit, Keiser took measures to enforce its policies in order to end those violations.  Those violations terminated.

16.     Some of Keiser's PPAs, Electronic Certifications, and Compliance Audits up to November 20, 2009, falsely indicated to the government that Keiser had been in full compliance with all requirements for the receipt of Title IV Funding.  As stated, however, Keiser had no knowledge of that falsity when submitting those materials to the government.

---

[3] To the extent that Plaintiffs, through the testimony of Armando Ortiz, complain about Magistrate Judge Snow's limitations on their ESI discovery, the Court notes that no appeal was taken to this Court.

[4] The Court finds that buying lunch for the whole teams (including admissions counselors) that achieved thirty (30) enrollments constituted an incentive.  Likewise, the gift cards, token days, and cruises amount to incentives given to the admissions counselors.

17.   On February 9, 2010, Keiser—with knowledge of some HEA violations from 2006 to 2009—submitted an Electronic Certification that incorrectly communicated to the government that Keiser had been in compliance with all requirements for the receipt of Title IV Funding.  On March 5, 2010, Keiser— with knowledge of some HEA violations from 2006 to 2009—submitted a Compliance Audit that incorrectly communicated to the government that Keiser had been in compliance with all requirements for the receipt of Title IV Funding for the year ending December 31, 2009.  Perhaps, Keiser rationalized that since they had stopped the incentive program that no disclosure was warranted. However, the past indiscretions should have been revealed to the Government so that possible sanctions could have been considered.  The failure to disclose the minor violations deprived the government of an opportunity to review the transgressions.

18.   Keiser's February and March 2010 submissions to the government would not have been false or incorrect had Keiser disclosed its knowledge that, from 2006 through 2009, some admissions counselors had received gift cards, token days, cruises, spa days, and/or meals as incentives for meeting enrollment goals.

## II.   CONCLUSIONS OF LAW

19.   The trial addressed the two remaining counts in this action: (1) Count I for Violation of Federal False Claims Act – HEA Title IV Funds; and (2) Count II for False Claim Through Promissory Fraud.  The Court will first consider whether Defendant is liable under each count.  The Court will then consider damages.

### A.   Liability Under Count I (Violation of Federal False Claims Act – HEA Title IV Funds)

20.   "To establish a cause of action under the [FCA], a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the

defendant to the United States for payment or approval; (3) with the knowledge that the claim was false." *United States v. R&F Props. of Lake Cnty., Inc.*, 433 F.3d 1349, 1355 (11th Cir. 2005). Some courts have identified four elements underlying FCA claims: "(1) the submission of a false claim; (2) scienter; (3) the false statement must be material to the government's decision to pay out moneys to the claimant; and (4) an actual claim or call on the government fisc." *See United States ex rel. Gillespie v. Kaplan Univ.,* No. 09–20756–CIV, 2013 WL 3762445, at *5 (S.D. Fla. July 16, 2013) (citing *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171–73 (9th Cir. 2006)). The Court finds that application of the three-element or four-element iteration will lead to the same holding. The Court will apply the four-element iteration in order to provide a more thorough analysis.

21.     The first element requires evidence that an actual false claim was submitted to the government. *See Klusmeier v. Bell Constructors, Inc.*, 469 F. App'x 718, 721 (11th Cir. 2012). "A 'claim' [is] defined to include a request for money that is presented to an officer, employee or agent of the United States." *United States ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, No. 2:11–cv–89–FtM–29DNF, 2013 WL 1149255, at *6 (M.D. Fla. Mar. 19, 2013) (quoting 31 § 3729(b)(2)(A)(I)).

22.     The "knowledge" or "scienter" element requires a showing that the actor "'(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.'" *United States ex rel. Clausen v. Laboratory Corp. of Am., Inc*., 290 F.3d 1301, 1307 n.12 (11th Cir. 2002) (quoting 31 U.S.C. § 3729(b)). Moreover, "[a] corporation can be held liable under the FCA even if

the verifying employee was unaware of the wrongful conduct of other employees." *United States v. Kaman Precision Prods., Inc.*, No. 6:09–cv–1911–Orl–31GJK, 2011 WL 3841569, at *5 (M.D. Fla. Aug. 30, 2011) (citing *Grand Union Co. v. United States*, 696 F.2d 888 (11th Cir. 1983)).

23.    The "materiality" element is objective, requiring the fact-finder "to determine only whether the proven falsehoods have a 'natural tendency to influence, or be capable of influencing, the payment or receipt of money or property.'" *United States ex rel. Feldman v. van Gorp*, 697 F.3d 78, 95 (2d Cir. 2012) (quoting 31 U.S.C. § 3729(b)(4)). There is no requirement that a plaintiff or relator show that the defendant's false statement actually influenced the government's decision to pay money to the defendant. *United States ex rel. Longhi v. United States*, 575 F.3d 458, 469 (5th Cir. 2009).

24.    "There is a cause of action under the [FCA] when an institution executes a PPA, whereby, in order to be eligible for Title IV funds, it agrees to comply with certain statutory and regulatory requirements, including a ban on incentive compensation for student recruiters, and submits or causes to be submitted requests for funds when the institution is not in compliance with the statutory and regulatory requirements." *United States ex rel. Gatsiopoulos v. Kaplan Career Inst.*, No. 09–21720–CIV, 2010 WL 5392668, at *3 (S.D. Fla. Dec. 22, 2010).

**(1)    The Submission of a False Claim**

25.    As stated, *supra*, Keiser—through some of its PPAs, Electronic Certifications, and Compliance Audits addressing the 2006 to 2009 calendar years—submitted false information to the government. Keiser's submissions represented that Keiser had complied with all federal requirements for the receipt of Title IV Funding. Keiser,

however, had violated the HEA by providing admissions counselors with incentives based on enrollment numbers. Thus, Keiser's failure to disclose its violations created a falsity in Keiser's submissions.

**(2)    Scienter/Knowledge of Falsity**

26.    As stated, *supra*, the HEA violations became known[5] to Keiser (either Dr. Keiser personally or Keiser University through the "Collective Knowledge Doctrine") as of November 20, 2009. Therefore, Keiser had no knowledge of the falsity of the PPA's, Electronic Certifications, and Compliance Audits submitted prior to November 20, 2009.

27.    Keiser did have knowledge of the falsity of claims submitted to the government through the February 9, 2010, Electronic Certification and the March 5, 2010, Compliance Audit. Both submissions represented that Keiser, during the 2009 year at the very least, had not violated any federal requirements for the receipt of Title IV Funding. When making those submissions to the government, Keiser was aware that it had provided admissions counselors with incentives based on enrollment numbers from 2006 to November 20, 2009.

**(3)    Materiality**

28.    The Electronic Certification and Compliance Audit were material to the government's decision to provide Title IV Funding to Keiser. An institution's compliance[6] with the HEA and with the restrictions on the provision of incentives for enrollment numbers has a natural tendency to influence, or be capable of influencing, the government's payment of Title IV Funding to that institution. The government may not have provided any Title IV Funding if Keiser had not completed the PPAs, Electronic Certifications, and

---

[5] The Court finds no evidence of deliberate ignorance or a reckless disregard for the truth.

[6] The Court is sympathetic to a university's ability to comply with each of the 402 subparts of the law.

Compliance Audits.  Moreover, the information conveyed through those documents—including the February 9, 2010, Electronic Certification and the March 5, 2010, Compliance Audit—had the natural tendency to influence the government's determinations as to whether to continue to provide Title IV Funding and the circumstances surrounding that Funding.  More specifically, that information affected the government's decision as to Keiser's eligibility for Title IV Funding, the time period for which Keiser could receive Funding, whether Keiser should be investigated further before receiving Funding, whether Keiser must alter any practices before receiving Funding, whether Keiser must pay fines or penalties before receiving Funding, or whether Keiser must reimburse previous Funding before receiving additional Funding. However, the Court notes that Keiser has survived an Attorney General Investigation, a subpoena from the Office of Inspector General, and a 2012 Department of Education Compliance Review, none of which have affected Keiser's Title IV Funding.

29.    Thus, Keiser's accurate completion of the February 9, 2010, Electronic Certification or the March 5, 2010, Compliance Audit would have the natural tendency to influence the government's decision(s) as to the circumstances or conditions surrounding Keiser's receipt of Title IV Funding.  Consequently, Keiser's failure to disclose those violations in the February 9, 2010, Electronic Certification or the March 5, 2010, Compliance Audit created a falsity that was material to the government's decision to continue to provide Keiser with Title IV Funding.

**(4)      An Actual Claim or Call on the Government Fisc**

30.     Keiser submitted PPAs, Electronic Certifications, and Compliance Audits to the government in order to receive Title IV Funding.   The government required those documents and would not have remitted Title IV Funding without those documents.

31.     The government did, in fact, remit $1,288,162,457.97 of Title IV Funding to Keiser as a result of Keiser submitting those documents.   Therefore, those documents, coupled with the resulting receipt of Title IV funding, constituted an actual claim or call on the government fisc.

32.     As stated, *supra*, two of those documents—the February 9, 2010, Electronic Certification and the March 5, 2010, Compliance Audit—were knowingly false when submitted by Keiser.   And the information in those documents was material to the government's payment of Keiser's claims.   The false information in those two documents came from Keiser.

33.     Thus, on two (2) occasions only, Keiser knowingly submitted false and material claims to the government, resulting in an actual claim or call on the government fisc.   Those two occasions constitute claims because they constituted conduct that caused the government to later pay out money.   Unlike the relators in *United States ex rel. Rostholder v. Omnicare, Inc.,* 745 F.3d 694 (4th Cir. 2014), the relators here have identified false statements.   Keiser is liable under Count I for those two (2) submissions.

34.     Finally, the FAFSAs submitted by students were not claims that were submitted or caused to be submitted by Keiser for the purposes of the FCA.   Keiser does not control the number, content, or submission of FAFSAs.   Students complete and submit FAFSAs at will.   If a student submits to the government false information on a FAFSA in order to

receive Title IV Funds, that student may be liable under the FCA.   If an institution submits to the government false information through PPAs, Electronic Certifications, or Compliance Audits, that institution may be liable under the FCA.  Institutions, however, cannot be liable for knowingly submitting or causing to be submitted false FAFSAs to the government where hundreds of thousands of students—without direct oversight by the institutions—control the content and submission of those claims.  In any event, there was no testimony in this case that Keiser caused any student to submit a claim, never mind a false claim.[7]

**B.    Liability Under Count II (False Claim Through Promissory Fraud)**

35.    To succeed on an FCA claim premised on a promissory fraud theory, the plaintiff "must show that the 'promise' was false when made."  *United States ex rel. Parato v. Unadilla Health Care Center, Inc*., 787 F. Supp. 2d 1329, 1340 (M.D. Ga. 2011).  "For a certified statement to be false under the Act, it must be an intentional, palpable lie.  Innocent mistakes, mere negligent misrepresentations and differences in interpretations are not false certifications under the Act."  *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996) (internal quotation marks and citations omitted).  Ultimately, "under either the false certification theory or the promissory fraud theory, the essential elements of False Claims Act liability remain the same: (1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due."  *Hendow*, 461 F.3d at 1174.

36.    As held at summary judgment, *see* [DE 194 at 8 n. 7], the Court does not find any material distinctions that warrant a separate analysis or conclusion under Count II.  The

---

[7] The Court is likewise uncomfortable classifying the submissions for Pell Grants as claims.  Even if the Court did make that classification, it is unclear how many submissions were actually made by Keiser to obtain Pell Grants.

February 9, 2010, Electronic Certification and the March 5, 2010, Compliance Audit were claims that included false promises that Keiser had been in full compliance with the HEA.  Accordingly, for the reasons stated as to Count I, Keiser is liable under Count II. However, the damages in Counts I and II merge, as they are based on the same two transactions.

**C.**     **Damages**

37.     "The FCA imposes two types of liability."  *United States v. Science Applications Int'l Corp.*, 626 F.3d 1257, 1277 (D.C. Cir. 2010).  "First, a defendant who submits a false claim or makes a false statement to get a false claim paid is liable for civil penalties regardless of whether the government shows that the submission of that claim caused the government damages.  Second, the defendant is liable for 3 times the amount of damages which the [g]overnment sustains because of the act of [the defendant]."  *Id.* at 1277-78 (internal quotation marks and citations omitted).

38.     The civil penalty ranges from $5,500 to $11,000 for each of the false claims.  *See, e.g.*, *United States v. Harris*, 303 F. App'x 348, 349 (7th Cir. 2008) (citing 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9)).  "The False Claims Act, however, does not set any specific formula for imposing civil penalties, but authorizes federal trial courts to award monetary relief that will afford the [g]overnment a base civil penalty amount that can be adjusted, in the court's discretion, up to the statutory ceiling."  *Morse Diesel Int'l, Inc. v. United States*, 79 Fed. Cl. 116, 124 (Fed. Cir. 2007).  Accordingly, courts must impose a civil penalty within the statutory range but have discretion in determining the penalty amount within that range.  *See id.* ("Congress . . . afforded the federal trial courts

considerable discretion in calculating damages and ascertaining the amount of the civil penalty component, within the statutory range.").

39.   "In calculating FCA damages, the fact-finder seeks to set an award that puts the government in the same position as it would have been if the defendant's claims had not been false."   *Science Applications Int'l Corp.*, 626 F.3d at 1278.   Therefore, "the government must show not only that the defendant's false claims caused the government to make payments that it would have otherwise withheld, but also that the performance the government received was worth less than what it believed it had purchased."   *Id.* at 1279.   Nevertheless, "the government will sometimes be able to recover the full value of payments made to the defendant, but only where the government proves that it received no value from the product delivered."   *Id.*   Thus, a fact finder, considering the relevant evidence, should calculate damages by first determining the amount the government paid because of a defendant's false claims and then subtracting the value the government nonetheless received from the defendant.   *See id.* at 1277-80.

   **(1)   Civil Penalties**

40.   Keiser knowingly submitted to the government two false claims leading to a call on the government fisc: the February 9, 2010, Electronic Certification and the March 5, 2010, Compliance Audit.   The Court will exercise discretion and impose a civil penalty of $5,500.00 for each of those two claims, for a total civil penalty of $11,000.00.

   **(2)   Actual Damages**

41.   In calculating damages, the Court should determine what the government's financial position would have been had Keiser's February 9, 2010, Electronic Certification and the

March 5, 2010, Compliance Audit been accurate.  In order for those documents to have

been accurate, Keiser would have needed to disclose that:

- contrary to its stated practices and policies, Keiser had discovered that from 2006 to November 20, 2009, some admissions counselors had received gift cards, token days, cruises, spa days, and/or meals based on meeting enrollment targets;

- the practice had involved the provision of a few thousand dollars of total incentives over that time period;

- Keiser had instructed that the practice cease immediately; and

- Keiser had no knowledge that the practice was continuing.

42. The relevant questions, therefore, are the following: (1) what actions would the government have taken vis-à-vis Keiser's Title IV Funding if Keiser had made those disclosures in February/March 2010; (2) what would the government's financial position be if it had taken those actions; and (3) how does that financial position compare to the government's current financial position?  When answering these questions, the Court must consider the preponderance of the evidence presented at trial.

43. Relators urge the Court to conclude that the government would have withdrawn all Title IV Funding given to Keiser during the relevant time period.  Relators' argument is straightforward.  Full compliance with the HEA is mandatory for the receipt of Title IV Funding.  Because Keiser was violating the HEA, it should not have received any Title IV grants or student loans for its students.  According to Relators, therefore, the government's damages consist of all the money it lost by providing grants and student loans to Keiser students during the relevant time period.  Relators suggest that the Court should treble that amount and then subtract a credit based on loan repayments recouped by the government.

44.  The Court, however, declines to adopt Relators' theory of damages.  The evidence does not establish that the government would have required reimbursement for or withdrawn all Title IV Funding for any time period had Keiser made the appropriate disclosures in February/March 2010.

45.  When a school violates the HEA, the U.S. Department of Education (the "DOE") has discretion to take a variety of actions.  *See* 34 C.F.R. § 668.81 (establishing regulations for actions where "an institution . . . violates any statutory provision of or applicable to Title IV of the HEA, any regulatory provision prescribed under that statutory authority, or any applicable special arrangement, agreement, or limitation entered into under the authority of statutes applicable to Title IV of the HEA.").  Those actions include the following:

- an emergency action, through which the DOE—only after following enumerated procedures—may, *inter alia*, "[w]ithhold Title IV, HEA program funds from a participating institution or its students . . . or [w]ithdraw the authority of the institution . . . to commit, disburse, deliver, or cause the commitment, disbursement, or delivery of Title IV, HEA program funds except in accordance with a particular procedure," *see* 34 C.F.R. § 668.83(a);

- fine proceedings, through which the DOE—only after following enumerated procedures—may impose a fine of up to $27,500.00 per violation by an institution, *see* 34 C.F.R. § 668.84;

- suspension proceedings, through which the DOE—only after following enumerated procedures—may suspend an institution's participation in Title IV Funding, *see* 34 C.F.R. § 668.85; and

- limitation or termination proceedings, through which the DOE—only after following enumerated procedures—may limit or terminate an institution's participation in Title IV Funding, *see* 34 C.F.R. § 668.86.

46.  An institution subject to these proceedings could request a hearing before a final decision is made by the DOE as to fines, suspensions, limitations, or terminations.  *See* 34 C.F.R. §§ 668.84-668.91.

47.    If Keiser had submitted accurate disclosures after November 20, 2009—when Keiser first had knowledge of its internal HEA violations relating to incentives for admissions counselors—the DOE could have chosen to initiate any one of these available actions or proceedings. The actions or proceedings may have led to various resolutions ranging from a fine to a temporary suspension to a full suspension to the imposition of a particular procedure for Keiser to follow in order to continue to receive Title IV Funding. Additionally, the DOE could have sought a reimbursement of all Title IV Funding provided to Keiser from 2006 through February/March 2010. *See* [Plaintiffs' Exhibits 4-9].

48.    There was no evidence at trial that the DOE would have attempted to suspend Keiser, fully terminate Keiser's Title IV Funding, or seek reimbursement for the Title IV Funding already received by Keiser. Similarly, there was no evidence that the DOE would have succeeded in obtaining any of those remedies.

49.    Indeed, it is notable that the government has been aware of Relators' allegations since February 1, 2012. *See* [DE 1]. The government was free to intervene in this action but did not do so. The DOE—subject to any applicable statute(s) of limitations—has been capable of initiating proceedings pursuant to 34 C.F.R. § 668.83 to address Keiser's HEA violations; however, there is no evidence that the DOE has taken any action. The government's conduct thus far has in no way indicated that, had Keiser disclosed its HEA violations, the government would have withdrawn or sought reimbursement for any portion of the $1,288,162,457.97 of Title IV Funding received by Keiser.[8]

---

[8] The Court is not impressed with Keiser's contention that an adverse ruling is or should be tantamount to a civil death penalty.

50.    Thus, the Court, in light of the available evidence at trial, cannot conclude that the government's financial position now is any worse than its financial position would have been had Keiser disclosed the existence of the HEA violations as of February/March 2010.[9]   Consequently, the Court finds that Relators have proven no actual damages arising from Keiser's submissions of false claims to the government through the February 9, 2010, Electronic Certification and the March 5, 2010, Compliance Audit.

51.    Furthermore, even if the evidence established that the government would have terminated Keiser's eligibility for additional Title IV Funding, the Court cannot conclude that the government has incurred financial damage by failing to implement that termination.

52.    First, if the government had withdrawn Keiser's Title IV Funding, the affected students may have chosen to attend other schools that were eligible for Title IV Funding.  As Mr. Argiz testified, there is no showing that the Department of Education would have denied any of the loans.  The government would have then provided Title IV Funding for those students, despite Keiser's loss of eligibility.   In other words, Title IV loans and grants follow students.  Therefore, the government would have saved money only if the students that would have attended Keiser either attended cheaper Title IV-eligible institutions or declined to attend any other Title IV-eligible institutions.   There is no evidence establishing either scenario.

53.    Second, the evidence at trial suggested that the government, through the Federal Credit Reform Act, treats federal student loans as profitable.  Plaintiffs' expert, Mr. Delisle,[10]

_____

[9] If this civil suit had never been brought but the Department of Education had conducted administrative proceedings and had reached the same findings about HEA violations and false claims as the findings herein, there is no indication that the result as to damages and penalties levied on Keiser would have been any different.

[10] Mr. Delisle is not a CPA, but has a graduate degree in Public Policy.  He had never before computed damages and could give only rough estimates, which were contrary to Mr. Argiz's testimony, which was given to a reasonable

provided testimony that the Congressional Budget Office—pursuant to the official calculation method mandated by the Federal Credit Reform Act—reports that federal student loans issued over the 2013-2023 period would result in $184 billion in net earnings to the government.  Federal grants, however, do result in direct losses for the government.

54.    It is unclear from the evidence at trial whether the combination of Title IV loans and grants issued by the government to Keiser students for any time period from 2009 to 2013 have resulted in an overall net financial loss or gain for the government.  The government may actually be in a stronger financial position now than it would have been had it suspended Title IV Funding from Keiser for any time period.

55.    For the foregoing reasons, the Court concludes that the government has not suffered any financial damage as a result of the two (2) false claims submitted by Keiser in 2010.  The evidence did not establish that, had those claims been accurate, the government would have sought or succeeded in obtaining a full reimbursement for previously disbursed Title IV Funding.  The evidence did not establish that, had those claims been accurate, the government would have sought or obtained a suspension or termination of subsequent Title IV Funding.  Finally, the evidence did not establish that a suspension or termination of subsequent Title IV Funding would have benefitted the government financially.  The evidence showed that Title IV Funding may have followed students to other institutions.  The evidence also showed that the government officially reports that it earns profits on federal student loans. Because the evidence did not establish that the government incurred any actual financial loss, no actual damages shall be awarded to the government.

---

degree of accounting probability.   However, with a different witness, there may have been a different conclusion on the profitability of loans.

### III.   CONCLUSION

Based on the foregoing findings of fact and conclusions of law, the Court holds as follows:

(a)      Plaintiffs prevail on Counts I and II;

(b)      The Defendant is liable for a civil penalty in the amount of $11,000;

(c)      Defendant is not liable for any actual damages;

(d)      The Court makes no current ruling with respect to attorneys' fees and costs, and the parties may file any timely and appropriate motions as to those issues; and

(e)      A separate Rule 58(a) Judgment will follow.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 14th day of August, 2014.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies provided to:

Counsel of record

22